**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PAUL M. EUSTACE, et al. | : | NO. 05-2973 |

**MEMORANDUM RE: SECOND INTERIM DISTRIBUTION**

Baylson, J.                                                                              **February 15, 2008**

**I.    Introduction**

This case involves a massive fraud in commodity futures trading.[1]  As discussed in
greater detail below, a settlement in a companion case (C.A. No. 06-1944) has resulted in
substantial settlement funds to be distributed to the defrauded investors.  The Court-appointed
receiver has moved to distribute funds on a pro rata basis to all defrauded investors, but an
objection to this distribution method has been filed.  The Court will uphold the propriety of the
receiver's proposed pro rata distribution plan.

**II.    Procedural History**

This complex case has a long and rather complicated history.  On June 22, 2005, the
Commodity Futures Trading Commission ("CFTC") instituted this action against Paul M.
Eustace, ("Eustace"), an individual, and Philadelphia Alternative Asset Management Company,
LLC ("PAAMCo"), an entity which he controlled.  The CFTC sought the appointment of a
receiver and other equitable relief to address the fraudulent activities of Eustace and PAAMCo.

---

[1] For more detailed descriptions of the facts underlying this case and Civil Action 06-
1944, see Memoranda reported at 2006 WL 3791341, 2006 WL 2869532, and 2006 WL
2707397.

On June 23, 2005, Judge Padova, to whom this case was originally assigned, issued a Statutory Restraining Order which appointed C. Clark Hodgson, Jr. as the Receiver (the "Receiver"), with the full powers of an equity receiver.  The Receiver was appointed for "PAAMCo and its partners, affiliates, subsidiaries and related entities," which includes the funds that Eustace controlled, namely the Philadelphia Alternative Asset Fund, Ltd. (the "Offshore Fund"), Philadelphia Alternative Feeder, LLC (the "Feeder Fund"), Option Capital Fund, LP ("Option Capital") and Philadelphia Alternative Asset Fund, LP (the "LP Fund") (collectively the "Receivership Funds").  On September 19, 2005, this Court entered a Consent Order, which, among other things, made the Receiver the permanent Receiver again for "PAAMCo and its partners, affiliates, subsidiaries and related entities," with the full powers of an equity receiver.

After this Court entered the Consent Order, four investors initiated ex parte proceedings in the Cayman Islands where the Receivership Funds were organized and their assets held.  The Grand Court of the Cayman Islands found that liquidation of the Offshore Fund should occur in the Cayman Islands and appointed two individuals, the Joint Liquidators of Philadelphia Alternative Asset Fund Ltd. (hereinafter "Joint Liquidators") to carry out that task.  The Receiver and the Joint Liquidators entered into a Protocol approved by this Court.  One of the points of contention in the current dispute involves an affidavit filed in the Cayman proceedings.  In late 2005, a Cayman Judge had requested expert opinions on the differences, if any, between U.S. and Cayman law regarding distributing assets to creditors and/or defrauded investors.  To address the matter, the Receiver filed the affidavit of an eminent bankruptcy and insolvency specialist, David T. Sykes, Esq. (hereinafter "Sykes Affidavit").  The dispute surrounding the Sykes Affidavit is discussed in greater detail below.

On May 8, 2006, in this Court, the Receiver initiated a separate civil suit asserting claims against Man Financial, Inc. ("Man")[2] and a Man employee named Thomas Gilmartin ("Gilmartin"), Civil Action 06-1944, alleging that Man and Gilmartin were liable to investors for acts and omissions related to Eustace's fraud.  Subsequently, the Receiver Ad Litem, Stephen J. Harmelin, Esq., ("RAL")[3] filed a Second Amended Complaint in CA 06-1944, naming UBS Fund Services (Cayman), Ltd. ("UBS") as a second defendant, and asserting claims based on the similar notion that UBS participated in and permitted Eustace's fraud.

On December 21, 2007, this Court approved a settlement agreement reached in C.A. 06-1944, between the RAL, Man, and Gilmartin, (Doc. No. 509), pursuant to which Man and Gilmartin paid $75 million to settle the claims asserted against them.  The Receiver now moves to distribute to defrauded investors $72 million of these settlement proceeds.

The $72 million would constitute the second interim distribution in this matter.  On October 6, 2006, the Court authorized the first interim distribution to defrauded investors, pursuant to which the Receiver paid $40 million Offshore Fund investors and $3.2 million to Option and LP Fund investors.  See Doc. Nos. 269 and 506.  This first interim distribution was not done on a pro rata basis among the investors in all funds, but instead the Receiver allocated funds recovered from the Option/LP fund to investors in the Option/LP fund, and allocated funds recovered from the Offshore Fund to investors in the Offshore Fund.  See Doc. No. 264, ¶¶ 21-24.

_____

[2] Man Financial is now known as MF Global, Inc.

[3] The background for the appointment of the RAL is addressed in the Court's Memorandum of May 3, 2007, filed in Civil Action 06-1944 (Doc. No. 241), 2007 WL 1314663.

For the Second Interim Distribution, the Receiver proposes a methodology different from that embraced in the First Interim Distribution.  As noted above, the Receiver now seeks to distribute settlement funds on a pro rata basis among investors in all funds, and also asks this Court to authorize the creation of reserves to pay for any future liabilities the Receivership Funds may incur.  See Doc. No. 506.  The Receiver requests this Court's approval to reserve $25.25 million to cover receivership costs and potential indemnification obligations.  The Receiver also requests approval to withhold distribution from investors who fail/refuse to release the settling parties in the Man settlement.

The Receiver's position was initially set forth in his Motion of December 19, 2007 (Doc. No. 506).  The Joint Liquidators objected to the Receiver's Proposed Distribution on January 11, 2008.  See Doc. No. 517.[4]  The CFTC filed a brief expressing the agency's general support for the Receiver but requesting that the Receiver further justify its position.  See Doc. No. 519.  In an apparent effort to respond to the CFTC's concerns and to further develop its arguments, the Receiver filed a Memorandum of Law in support of his Motion (Doc. No. 521) and a supporting affidavit from Michael Cordone, Esq. (Doc. No. 522) (hereinafter "Cordone Affidavit").  The Joint Liquidators also supplemented their objections with a letter to the Court, dated January 29, 2008,[5] and in that letter propose their own methodology for distributing the settlement funds.

This Court held a hearing on the Receiver's Motion on January 31, 2008.  At the conclusion of the hearing, the Court requested that the Receiver file a Reply Brief to address

---

[4] There do not appear to be any objections, by the Joint Liquidators or others, to the Receiver's proposed creation of reserves.  This memorandum therefore focuses on distribution methodology.

[5] This letter became part of the record at the January 31st hearing, discussed infra.

issues that arose at the hearing.  The Receiver timely filed the requested brief (Doc. No. 531), and the contentions of the respective parties are addressed below.

### III.    Contentions

####     A.    Receiver

According to the documents before the Court and the proceedings at the hearing of January 31, 2008, the Receiver seeks authorization to distribute the Man settlement funds on a pro rata basis to investors in the Offshore Fund and the LP/Option Fund.[6]  The Receiver's proposed pro rata allocation would distribute 88.93% of the settlement monies to Offshore Fund investors and 11.07% of the monies to LP/Option Fund investors.  The computation is not disputed.  Expenses would also be allocated pro rata between the Offshore Fund and LP/Option Fund investors.

The Receiver provides several arguments in support of its proposed pro rata distribution plan, which essentially pools collected proceeds, from all sources, then deducts expenses on a pro rata basis and distributes 11.07% of the net proceeds to LP/Option Fund investors and 88.93% of the net proceeds to Offshore Fund investors.  First, regarding the Man Settlement monies currently at issue, the Receiver disagrees with the Joint Liquidators' contention that the Man Settlement proceeds should only be distributed to Offshore Fund investors.  The Receiver argues that the Option and LP Funds can not be excluded from the Man Settlement proceeds because the Option and LP Funds were named plaintiffs in the suit against Man, without objection.  The Receiver also argues that the Man Settlement explicitly states that it settles the claims of the

---

[6] The parties do not dispute that for present purposes, the Option Fund and the LP Fund may be treated as one entity.  The Feeder Fund is considered part of the Offshore Fund.

Offshore and Option/LP Funds, and thus it would make no sense to distribute the settlement proceeds only to the Offshore Fund investors.

In support of his plan to generally pool these and any future recovered proceeds before distributing them pro rata, the Receiver relies on evidence indicating that Eustace commingled funds and marketed them as being traded together.  For example, according to the Receiver, Eustace used the purportedly successful investment results of the LP Fund to entice potential investors to invest in the Offshore Fund.  The Receiver also argues that deposition testimony indicates that LP Fund investors believed that the LP Fund was being traded pari passu with the Offshore Fund.  The Receiver contends that facts such as these support the pooling of Offshore Fund and Option/LP Fund proceeds and subsequent pro rata distribution.  (See Cordone Affidavit, ¶¶ 12-16.)

At the hearing of January 31, 2008, the Receiver's counsel explained that when the Receiver moved for approval of the First Interim Distribution and stated that it did not appear "that Option Capital's or the LP Fund's assets were ever commingled with the assets of the Offshore Fund" (Doc. No. 264, ¶ 21), he did not have the benefit of the substantial evidence he has since uncovered.  The Receiver argued that the uncovered evidence illustrates Eustace's commingling and joint marketing to the point where pooling the overall settlement funds for pro rata distribution would be fair and equitable.

According to the Receiver, the majority of courts favor pro rata distribution.  The Receiver cites a non-precedential Third Circuit opinion, SEC v. The Infinity Group, 226 Fed. Appx. 217, 218-219 (3d Cir. Apr. 6, 2007), as well as law from other circuits and the Supreme Court case of Cunningham v. Brown, 265 U.S. 1, 13 (1924).

In response to the Joint Liquidators' argument that the Sykes Affidavit indicates that In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) should apply, the Receiver contends that the Joint Liquidators misread the Sykes Affidavit.  According to the Receiver, the Sykes Affidavit states that Owens Corning would apply if a party were seeking substantive consolidation of the funds.  However, since no party is doing so, the Sykes affidavit does not opine that Owens Corning applies.

Furthermore, according to the Receiver, Owens Corning should not control because Owens Corning applies to courts exercising bankruptcy powers, and this Court does not exercise such powers.  The Receiver also argues that since Owens Corning addressed a debtor's attempt to create a "deemed consolidation" of distinct corporate entities in a bankrupt estate in order to defeat a creditor's claim, Owens Corning differs factually from this case.

### B.    Joint Liquidators[7]

The Joint Liquidators contend that instead of pro rata distribution, the most equitable methodology would entail distributing proceeds to fund investors based on each fund's legal entitlement to the proceeds.  According to the Joint Liquidators, LP and Option Fund investors have no right to proceeds from the Man Settlement, and argue that such proceeds should go to Offshore Fund investors only.

The Joint Liquidators support their Objection with several arguments.  As to the Man

---

[7] The Joint Liquidators state that their Objection was authorized by the Investors' Committee of the Offshore Fund.  Although there was some dispute about this, it is not material for the Court's decision.  The Court would also like to note that it received three letters from investors and that at the hearing on January 31, 2008, counsel for an investor testified.  The letters from investors supported the Receiver's proposed pro rata distribution plan.  The testimony at the hearing was on behalf of two of the investors.

Settlement, the Joint Liquidators contend that the money that was the subject of Man's allegedly wrongful conduct was only Offshore Fund money, and the settlement proceeds should thus go only to Offshore Fund investors.  The Joint Liquidators argue that the LP/Option Funds did not lose any money as the result of trades made at Man and that there is no evidence that Man intended to defraud the LP/Option Funds.  The Joint Liquidators also contend that Eustace's marketing representations (for instance, that the Offshore Fund and LP/Option Funds would be traded pari passu) are irrelevant as to the Man Settlement proceeds because there is no evidence that Man participated in making the marketing representations.

The Joint Liquidators state that to their knowledge, "there is not evidence of systematic commingling of funds."  (Doc. No. 517, ¶ 3.)  As to certain instances of commingling, the Joint Liquidators argue that the actual funds that were commingled could be distributed pro rata, but that isolated, traceable instances of commingling do not support a pro rata distribution of all monies.  As to Eustace's general joint marketing of the Receivership Funds, the Joint Liquidators contend that if Eustace misrepresented the returns on the Option/LP Funds, those Funds have a claim against Eustace for fraud, but do not have claims against Man, UBS, and the Offshore Fund Directors, and should thus not benefit from settlement proceeds against those entities.[8]

The Joint Liquidators argue that In re Owens Corning, supra, controls.  According to the Joint Liquidators, the case law cited by the Receiver applies to situations where there is a single

---

[8] The Joint Liquidators take the position that six categories of funds are or may become available for distribution:  1) $72 million in Offshore Funds initially frozen by CFTC and the Receiver; 2) $6.4 million in Option/LP Funds initially frozen by CFTC and the Receiver; 3) $75 million in settlement funds from Man; 4) whatever settlement funds are obtained from UBS and approved by the Court; 5) whatever in settlement funds are obtained from Lashbrook/Somerville and approved by the Court; and 6) any funds obtained from Paul and Laura Eustace, PAAMCo, and Wallace/Gobora.

fund, as opposed to this situation, where there are multiple funds.  The Joint Liquidators argue

that because the Receiver previously represented that there were no grounds for pooling and pro

rata distribution, he should therefore not be permitted to change his position and seek pro rata

distribution at this point, pointing to the Sykes Affidavit as indicative of the Receiver's previous

position.  As noted above, the Sykes Affidavit calls for the application of Owens Corning and

was submitted by the Receiver in related proceedings in the Cayman Islands.

Finally, the Joint Liquidators contend that the Receiver's motion is too broad, in that it

applies "to all recoveries, from whatever source."  The Joint Liquidators oppose such a broad

application of the Receiver's plan because, for example, it would unfairly apply to the potential

future distribution of UBS settlement funds.  The Joint Liquidators contend that because the

claims against UBS were brought on behalf of the Offshore Fund only, any future settlement

proceeds from UBS should be distributed to the Offshore Fund investors only.

**IV.    Discussion**

Courts have broad discretion in supervising an equity receivership.  SEC v. Black, 163

F.3d. 188, 199 (3d Cir. 1998) ("where there is a receiver with equitable power in a proceeding

before it, the District Court has wide discretion as to how to proceed"); FDIC v. Bernstein, 786 F.

Supp. 170, 177 (E.D.N.Y. 1992) ("one common thread keeps emerging out of the cases involving

equity receiverships – that is, a district court has extremely broad discretion in supervising an

equity receivership").  This discretion extends to the review of a receiver's proposed distribution

plan.  See SEC v. Forex Asset Management LLC, 242 F.3d 325 (5th Cir. 2001) (analyzing the

district court's approval of the receiver's distribution plan under an abuse of discretion standard

because  "the district court was 'acting pursuant to its inherent equitable powers' when it

approved [the receiver's distribution] plan." (quoting <u>United States v. Durham</u>, 86 F.3d 70, 72 (5th Cir. 1996))).

As noted above, this Court appointed the Receiver for "PAAMCo and its partners, affiliates, subsidiaries and related entities."  The Receiver has a duty to act on behalf of all these entities.  <u>See</u> <u>CFTC v. Eustace</u>, 2007 WL 1314663 at *6 (E.D. Pa. May 3, 2007) ("The Receiver is a fiduciary to the Court and to the investors, appointed on motion of the CFTC.")  <u>See also</u> P. Dawes, W. Meeske & M. Rappe, <u>Business and Commercial Litigation in Federal Courts</u>, § 14:63 (2d ed. ABA Litig. Sec.) (<u>quoting</u> 1 <u>Clark on Receivers</u> § 11(a) (3d ed. 1959) ("A receiver is 'an officer of the court to receive, collect, care for, administer and dispose of the property or the fruits of the property of another or others brought under the orders of the court . . .'".) Because the Receiver is a fiduciary and officer of this Court, this Court may and does give some weight to the Receiver's judgment of the most fair and equitable method of distribution.

The Court agrees that <u>Owens Corning</u> does not control the result.  As the first sentence of the <u>Owens Corning</u> opinion states, "We consider under what circumstances a court exercising bankruptcy powers may substantively consolidate affiliated entities."  <u>Owens Corning</u>, 419 F.3d at 199.  <u>Owens Corning</u> devotes considerable attention to the history of substantive consolidation and to the theories behind substantive consolidation.  However, substantive consolidation is not at issue in this case.  Furthermore, <u>Owens Corning</u> applies to bankruptcy proceedings, and this Court does not exercise bankruptcy powers.

<u>Owens Corning</u> rejected substantive consolidation as an appropriate equitable remedy when debtors were separate legal entities and some creditors sought "deemed" substantive consolidation of the debtor entities so that they could obtain greater payments.  <u>Owens Corning</u>

-10-

does not apply to the case at bar because the facts are different, the current legal context differs, and there was no court-appointed equity receiver in <u>Owens Corning</u>.

The Court finds the role of the court-appointed equity receiver in this case to be very relevant and unique.  In <u>Owens Corning</u>, the Third Circuit found that the proponents of substantive consolidation were engaged in a "ploy to deprive one group of creditors of their rights while providing a windfall to other creditors."  <u>Owens Corning</u>, 419 F.3d at 200.  In contrast, the Receiver was appointed by this Court to represent the interests of all of the Receivership Funds.  The Receiver's proposed distribution represents the plan the Receiver has deemed the most fair to all groups of investors.

As to the Sykes Affidavit, its discussion of <u>Owens Corning</u> indeed assumes the context of substantive consolidation.  The Sykes Affidavit states:

> *[w]ere a motion seeking consolidation to be filed in the US District Court*, that court would likely refer to the law in the United States Third Circuit, particularly to decisions of the Court of Appeals for the Third Circuit . . . The most recent decision of the Court of Appeals for the Third Circuit on substantive consolidation is <u>In re Owens Corning</u>. . .

Sykes Affidavit, ¶ 18 (emphasis added.)

As an initial matter, the Court does not read this language to mean that <u>Owens Corning</u> applies outside the context of substantive consolidation.  Perhaps more importantly, the relevance of the Sykes Affidavit to the matter at hand is questionable.  The Sykes Affidavit was sworn on November 30, 2005, more than two years ago.  Since that time, the Receiver has gained a considerably greater understanding of Eustace's fraud and the relationships among the Receivership Funds, among other things.  Specifically the Sykes Affidavit was submitted to the Cayman Court "before the extensive discovery of Eustace, investors and others proving both the

-11-

commingling and the joint marketing of the Receivership Funds." (Receiver's Reply Br., Doc.

531, p. 4.) As discussed above, the Receiver is court-appointed to represent the best interests of

the Receivership Funds and may change his position as he obtains new information.

> The Sykes Affidavit states that as of November 30, 2005:
>
> the Receiver ha[d] not seen any evidence that the monies invested in the Fund and
> the Feeder Fund were commingled with monies invested in other funds organized
> and operated by Eustace. Further, the Receiver has maintained and preserved the
> separate assets of the Receivership Defendants and has indicated his intention to
> continue such course of action.

Sykes Affidavit, ¶ 18.

This language, as well as the methodology of the First Interim Distribution, discussed

above, seems to indicate that the Receiver has indeed changed his position as to the appropriate

distribution methodology, which is well within the discretion of a court-appointed equity

receiver.[9]

The Receiver and the CFTC have both cited case law more closely related to the matter at

hand. When an equity receivership is involved, case law concerning equity receiverships is

generally more applicable than bankruptcy case law. See CFTC v. Eustace, supra, 2007 WL

1314663 at *6. The Receiver relies on three cases from other circuits which affirm district court

orders approving equity receivers who proposed pro rata distribution of funds from sources that

at some point had been distinct from one another. See SEC v. Forex Asset Management LLC,

242 F.3d 325 (5th Cir. 2001) (affirming district court's order that approved receiver's plan to

---

[9] According to the Receiver, the First Interim Distribution (using a different methodology
than the methodology presently at issue) resulted in Offshore Investors receiving 91.905% of the
distributed proceeds. See Receiver's Motion, Doc. No. 506, FN 1. The Receiver currently
proposes that Offshore Investors receive 88.93% of collected and future funds.

distribute investment company's assets pro rata even though funds of one investor pair were segregated from those of other investors); CFTC v. Topworth Int'l, Ltd., 205 F.3d 1107 (9th Cir. 1999) (affirming order that adopted receiver's plan and overruled defrauded investor's objection to pooling of three funds and subsequent pro rata distribution); SEC v. Elliot, 953 F.2d 1560 (11th Cir. 1992) (affirming district court's disallowance of tracing, treatment of three companies as a single entity, and approval of receiver's proposed pro rata distribution).  The Joint Liquidators have not even attempted to show why these decisions should not be followed.

Furthermore, the Supreme Court has recognized that for purposes of equity, tracing principles can be suspended.  Cunningham v. Brown, 265 U.S. 1, 13 (1924).  Although it did not involve a receivership, Cunningham is instructive in that the Supreme Court refused to compel the use of tracing methods to distribute monies to victims of a Ponzi scheme and instead affirmed the order of pro rata distribution.  Id.

The Receiver has pointed to many facts that support his pro rata distribution plan. Eustace's commingling was not necessarily systematic, but the instances of commingling indeed reflect Eustace's blurring of the distinction between the Receivership Funds.  For example, Eustace took $607,000 from an Option Capital account and effectively deposited the money in the Offshore Fund, without any disclosure to investors.  (Michael Cordone Affidavit, ¶ 8); (add cite to a SJ memo that addresses this fact).  An additional $2,097,665.85 of LP Fund money was invested into the Feeder Fund (part of the Offshore Fund) without any disclosure to investors. (Michael Cordone Affidavit, ¶ 10).  Also, at the hearing of January 31, 2008, counsel for the Receiver stated that there were LP Fund investors who thought their investments had been shifted over to the Offshore Fund, but in fact, the investments remained in the LP Fund.  See

transcript of hearing, January 31, 2008, p. 13.

The Court also finds Eustace's joint marketing of the funds to be relevant because it encouraged investors to perceive the funds as a part of a whole.  For example, according to the Receiver, investors in the LP Fund were told that their investments would be rolled into the Offshore Fund.  (Michael Cordone Affidavit, ¶ 12.)  Furthermore, "[t]he LP Fund investors and the individuals marketing all of the Receivership Funds actually believed that the Option Capital, LP Fund and the Offshore Fund were all being traded at the same place in the same pool of assets, and only one set of numbers was provided to reflect every fund's performance."  Id. Offshore Fund investors were also enticed to invest in the Offshore Fund by the LP Fund performance data.  (Michael Cordone Affidavit, ¶ 14.)  At the January 31st hearing, the Receiver added a letter to the record (Receiver's Exhibit 1) dated October 27, 2004, from Eustace to investors, in which Eustace stated that the LP Fund and the Offshore Fund were traded pari passu.

The Court finds the Joint Liquidators' argument that the LP/Option Fund investors do not deserve any part of the Man Settlement proceeds to be an extreme and unsupportable position. Not only were the LP/Option Fund investors plaintiffs in the case against Man, the Settlement Agreement specifically references their claims as settled.  Furthermore, the LP/Option Fund investors have been paying for the litigation against Man since its inception.[10]

---

[10] See transcript of hearing, January 31, 2008, pp. 16-17, where counsel for the Receiver explains that the Option/LP Fund has been paying 15.86% of Receivership costs and expenses, and the Offshore Fund has been paying 84.14% of Receivership costs and expenses.

**V.     Conclusion**

For the reasons stated above, this Court will grant the Receiver's Motion for a Second Interim Distribution and approve its <u>pro</u> <u>rata</u> distribution methodology as well as its creation of reserves.

The Court has just been advised that the remaining defendants in Civil Action 06-1944 have also settled, and pending court approval of these settlements, the distribution approved in this Memorandum may also apply to the remaining settlements.  If a dispute arises about the distribution of remaining settlements, future pleadings should reference this Memorandum.

An appropriate order follows.

A:\05-2973 Memo re Second Interim Distribution.wpd